Elie Honig, Esq.
Claudia Lorenzo, Esq.
Andrew L. Dubin, Esq.
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel:   973-597-6252
*Attorneys for Plaintiff Keith Boykin*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEITH BOYKIN,<br><br>                             Plaintiff,<br><br>                  v.<br><br>THE CITY OF NEW YORK,<br><br>                             Defendant. | Civil Action No.: 1:21-CV-1362-DLC<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Keith Boykin ("Mr. Boykin"), through his Amended Complaint against Defendant the City of New York ("City"), alleges as follows:

**PRELIMINARY STATEMENT**

1.      Mr. Boykin seeks judgment against the City for violating his rights under the First and Fourth Amendments to the Constitution of the United States.

2.      On May 30, 2020, Mr. Boykin, as a member of the press, was reporting on the protests occurring in New York City when members of the New York Police Department ("NYPD") improperly arrested him without cause.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over Mr. Boykin's claims of violation of federal constitutional rights under 28 U.S.C § 1331 because this case arises under 42 U.S.C. § 1983.

4. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Mr. Boykin's claims occurred in the Southern District of New York.

## PARTIES

5. Plaintiff Keith Boykin is an individual who resides in the State of New York. He is a freelance reporter. In 2020, Mr. Boykin attended the protests in New York City following the death of George Floyd to report on them.

6. Defendant City of New York is a municipal corporation within the State of New York. As a local government entity, the City is a juridical entity under 42 U.S.C. § 1983. The NYPD is an agency of the City.

## FACTUAL ALLEGATIONS

**A.   Background on Mr. Boykin and George Floyd Protests**

7. Keith Boykin has worked as a CNN political commentator and is a *New York Times* best-selling author. Mr. Boykin served in the White House as a special assistant to President Bill Clinton, where he was once the highest-ranking openly gay person in the Clinton White House. He also helped organize and participated in the nation's first-ever meeting between a sitting president and leaders of the LGBTQ community.

8. A graduate of Dartmouth College and Harvard Law School, Mr. Boykin has taught at the Institute for Research in African-American Studies at Columbia University in New York City and American University in Washington, D.C. He is a co-founder and first board president of

the National Black Justice Coalition and a Lambda Literary Award-winning author of four books. *The New York Times*, *The Washington Post*, CNN, Black Entertainment Television, and many other news outlets have published his writing, and he regularly posts commentary and reporting for his hundreds of thousands of followers on social media.

9.      Mr. Boykin has roughly ten years of experience covering protests as a member of the press.

10.     On May 25, 2020, George Floyd, an unarmed Black man, died in police custody in Minneapolis, Minnesota when a white police officer, Derek Chauvin, knelt on Mr. Floyd's neck for eight minutes and 46 seconds. Mr. Floyd repeatedly gasped, "I can't breathe." The officer did not remove his knee even after Mr. Floyd lost consciousness and for a full minute after paramedics arrived at the scene. Mr. Floyd was declared dead less than an hour later. Official and independent autopsies determined his death was a homicide.

11.     Individuals on social media and news outlets shared video coverage of Mr. Floyd's brutal killing, leading to worldwide protests, including in New York City, against police brutality, police racism, and lack of police accountability.

**B.      Mr. Boykin's Arrest**

12.     Upon information and belief, during the protests, NYPD officers at times engaged in unconstitutional behavior through their unofficial customs or practices.

13.     In the days after Mr. Floyd's murder, widespread protests continued throughout New York City's boroughs, including on May 30, 2020.

14.     On May 30, Mr. Boykin, who was working as a freelance reporter covering the protests, followed the George Floyd protests around Manhattan. The protest began in Harlem and proceeded south towards the Upper West Side.

15. Mr. Boykin had his press badge on his person, in his wallet, when reporting. He used his bicycle as a means of transportation to cover ground across New York City.

16. During the day, Mr. Boykin posted various videos and photographs on his Twitter account and interviewed protestors. Mr. Boykin had nearly 200,000 Twitter followers at that time.

17. Media coverage of the George Floyd protests, including Mr. Boykin's coverage, was vital to keep New York City residents, Americans, and citizens around the globe informed.

18. Eventually, the protestors marched onto and down the West Side Highway in Manhattan.[1]

19. To facilitate the ongoing protests and to protect the protestors, around West 99th Street on the West Side Highway, the NYPD blocked off all three traffic lanes (far left, middle, and far right lanes) on the southbound side using police vans.

20. At the same time, on the northbound side, the NYPD blocked off all three traffic lanes (far left, middle, and far right lanes) with police vans.

21. As the protestors, who were marching south on both the northbound and southbound sides of the West Side Highway from around West 104th Street, continued south towards the West 95th Street exit, a group of at least ten NYPD officers in riot gear marched north towards the protestors.

22. As the NYPD officers moved north, one officer stated to the others, "We don't need to grab every one of them. Grab one each. They don't need a warning. They're all under arrest."

23. Mr. Boykin, who had been following the protestors on his bicycle, pulled off to the side of the highway at about West 101st Street to post some of his coverage to social media.

---

[1] The West Side Highway is a road that runs from West 72nd Street along the Hudson River to the southern tip of Manhattan in New York City. North of 72nd Street the roadway continues north as the Henry Hudson Parkway. For sake of uniformity and simplicity, we will refer to them collectively as the West Side Highway.

24. Mr. Boykin did not obstruct traffic. The officers had already shut down the roadway to vehicular traffic for purposes of the protest. Mr. Boykin did not interfere with the police's duties. Nor did he participate in the protest in any capacity.

25. NYPD officers approached Mr. Boykin and he notified the officers that he was with the press. The officers walked past him, but they quickly turned around and approached him again.

26. Mr. Boykin once again notified the NYPD officers that he was with the press. One officer, in response to Mr. Boykin, replied, "I don't care. You can't be on the road. Get off the bike. You are under arrest."

27. At about 3:30 p.m., the NYPD improperly arrested Mr. Boykin, without warning and regard for his ongoing work as a member of the press. NYPD officers used zip ties to restrain Mr. Boykin's hands behind his back. At no time did the officers explain why they were arresting Mr. Boykin. The officers did not claim that his press coverage was interfering with the officers' duties, nor did they ask him to take alternative actions to cover the protest and avoid arrest. Nor did officers explain why Mr. Boykin was not free to cover the protests on the very same street that the NYPD itself had closed down specifically for purpose of facilitating those protests.

28. While the NYPD arrested Mr. Boykin, his phone, which he used for reporting, fell and hit the ground. His phone's screen broke.

29. Police then walked Mr. Boykin backwards—which prevented him from observing where the police were taking him—to a police van parked in the middle lane of the southbound side of the West Side Highway.

30. Once the arresting officers walked Mr. Boykin to the police van, they spun him around to face two other officers who were standing outside the police van. While this occurred,

the officers and Mr. Boykin all stood in the left lane of the southbound side of the West Side Highway, blocking all traffic from passing.

31. Outside the van, the police began processing Mr. Boykin. A female officer stationed outside the van took down some information about Mr. Boykin's arrest on a notepad and then took a picture of him on her device alongside one of the arresting officers.

32. During the processing, one of the two arresting officers took Mr. Boykin's driver's license out of his wallet. Despite reassuring him that he would receive his license back, the police never returned it.

33. The NYPD never read Mr. Boykin his Miranda rights during his arrest.

34. After conducting the initial intake, which included seizing Mr. Boykin's wallet, phone, and keys and placing them inside a manila envelope, officers placed him inside the police van, seat-buckled him, and continued processing him.

35. The police van did not have any windows nor did the air conditioner work. This arrest occurred during the early days of the COVID-19 pandemic, months before vaccines were available. Despite this health risk, officers still closed the van doors.

36. As a result, Mr. Boykin suffered distress because of (1) extreme heat, (2) anxiety because of being in a closed-door van, and (3) his history of syncopal episodes (fainting).

37. Mr. Boykin notified the officers that he was uncomfortable from the heat. The officers kept the van doors closed, but they were eventually able to fix the air conditioner.

38. Mr. Boykin also told the officers that the zip ties were too tight and hurting him. The officers advised him that they did not have the proper equipment to remove the zip ties and that he would have to wait until they arrived at the prison cell.

39. The zip ties caused Mr. Boykin pain, irritation, and bruising.

40. Police later arrested another man and placed him in the van alongside Mr. Boykin. After the NYPD left Mr. Boykin to wait in the van for over an hour, officers escorted Mr. Boykin to a prisoner transport bus.

41. NYPD officers placed Mr. Boykin into one of the cages inside the bus along with other individuals whom the NYPD had arrested that afternoon. Mr. Boykin remained in this un-air-conditioned bus for roughly an hour.

42. NYPD officers ultimately transported Mr. Boykin to the NYPD's headquarters at One Police Plaza. At police headquarters, NYPD officers placed Mr. Boykin in a cell with roughly 35 other inmates.

43. Since no social distancing was observed and most inmates did not wear masks, the NYPD unnecessarily increased Mr. Boykin's risks of contracting the Coronavirus. They caused him distress about the possibility of contracting the Coronavirus because he was in close contact with others.

44. While the NYPD detained him at One Police Plaza, Mr. Boykin could not contact anyone because the payphone there was not functioning. Police did not provide Mr. Boykin with any alternative means of communication.

45. While the NYPD detained Mr. Boykin in the prison cell, no officers provided him with any information about when they would release him. Mr. Boykin started to fear that he would have to spend the night in the cell under these conditions.

46. In total, the NYPD detained Mr. Boykin for approximately six hours, including four hours in the prison cell. The police charged him with two minor offenses: (1) "Disorderly Conduct – Blocking Vehicular Traffic" and (2) "Walking on a Highway."

47. The next day, Mayor Bill de Blasio's then-press secretary Freddi Goldstein emailed Mr. Boykin, stating in relevant part, "I want to apologize for what happened to you today. It never should have happened. We are working with the NYPD to dismiss your summons, and will let you know when it is finalized in the morning."

48. On June 5, 2020, New York State Attorney General Letitia James contacted Mr. Boykin by direct message on Twitter, stating, "Hi Keith, my team is eager to connect with you about your encounter with the NYPD. Can you please provide us with the best way to reach you? Thank you in advance."

49. The State of New York eventually dismissed the two criminal offenses against Mr. Boykin on September 9 and 14, 2020. Contrary to its initial assurances that the City would dismiss the complaints properly, it took the City over three months to dismiss the meritless charges, and only after this firm legally represented Mr. Boykin regarding this matter.

## C. The City's Widespread Custom and Practice of False Arrests and Infringement of First Amendment Rights at Large-Scale Protests

50. Members of the press and public have the right to gather, receive, record, and disseminate information and observe and report on police behavior under the United States and New York State constitutions.

51. Protestors also enjoy constitutionally protected rights to speech, expression, and peaceful assembly.

52. NYPD officers intentionally interfered with the exercise of these rights through excessive force, false arrest and unlawful detention, threats of force and arrest, and unlawful dispersal of peaceful assemblies.

53. The NYPD's arrest of Mr. Boykin is one of the many instances of the NYPD's unconstitutional practices when policing large-scale protests.

54. The NYPD's practice of using excessive force and unlawfully arresting protestors started well before the racial justice protests of 2020.

55. Following a 2003 anti-war protest, an investigation by the New York Civil Liberties Union ("NYCLU") documented 198 accounts of excessive force by NYPD officers, including the use of horses and batons to disperse crowds as well as indiscriminate pepper spraying. This investigation also documented the use of crowd control tactics such as physically preventing demonstrators from reaching their rally location, herding protestors into pens fashioned from metal barricades, and mass arrests.[2]

56. The NYCLU documented similar unconstitutional practices at protests of the 2004 Republican National Convention ("RNC"). NYCLU received over 200 complaints from witnesses at the RNC protests and published on its website a report finding that the NYPD "severely undermined" protesters' rights in part through, among other things, "mass arrests of hundreds of peaceful demonstrators and bystanders" and "the pervasive surveillance of lawful demonstrators."[3]

57. In 2006, the Civilian Complaint Review Board ("CCRB"), an independent NYPD oversight agency, published its own findings about the RNC protests following an investigation of 63 complaints. The CCRB found that then-Deputy Chief of the NYPD Terence A. Monahan and another deputy chief failed to make their orders to disperse sufficiently audible, understandable, or with enough time to allow protesters to leave before effecting arrests, leading to the unlawful mass arrest of nearly 250 protesters

---

[2] N.Y. Civil Liberties Union, *Arresting Protest* (2003), https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

[3] N.Y. Civil Liberties Union, *Rights and Wrongs at the RNC* (2005), https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

58. Following large-scale demonstrations in downtown Manhattan in 2011, known as the "Occupy Wall Street" protests, the Protest and Assembly Rights Project widely shared a 2012 report detailing 130 complaints of excessive or unnecessary force against protesters, bystanders, lawyers, legal observers, and journalists. These claims included over a dozen instances when officers interfered with independent monitoring by journalists and legal observers by threatening to or in fact arresting them, and the repeated use of kettling[4] against peaceful protesters, which "inflamed tensions," "caused confusion and panic," and "chilled ongoing and future protest activity."[5]

59. Following the NYPD's unlawful actions during the 2003 anti-war protests, the 2004 RNC protests, and the 2011 Occupy Wall Street protests, individuals filed hundreds of complaints and several lawsuits against the NYPD alleging, among other things, that the NYPD (1) used unnecessary and excessive force against peaceful protesters, bystanders, legal observers, and journalists, and (2) effected unlawful and mass arrests without probable cause. The lawsuits, which arose from these protests, often led to findings of liability or potential liability against the NYPD,[6] or settlements.[7]

---

[4] Kettling refers to the police tactic for controlling large crowds during demonstrations or protests by surrounding and restricting the movement of a crowd of people, making it harder for them to escape.

[5] Protest & Assembly Rights Proj., *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (2012), https://cdn.theatlantic.com/static/mt/assets/politics/Suppressing%20Protest.pdf.

[6] *See, e.g.*, Verdict Sheet, *Gersbacher v. City of New York*, No. 14-cv-7600 (S.D.N.Y. Jan. 11, 2018) (ECF 201) (verdict against NYPD supervisor on protester's excessive-force claim); *Dinler v. City of New York*, 2012 WL 4513352, at *8–11, *27 (S.D.N.Y. Sept. 30, 2012) (finding kettling of hundreds of protesters unconstitutional and granting plaintiffs' motion for summary judgment); *Brown v. City of New York*, 798 F.3d 94, 97, 100–03 (2d Cir. 2015) (officers' takedown and pepper spraying of protester could be excessive force); *Douglas v. City of New York*, 730 F. App'x 12, 14–17 (2d Cir. 2018) (reversing summary judgment to defendants on legal observer's excessive force, false arrest, and other claims); *Case v. City of New York*, 408 F. Supp. 3d 313, 320–22, 327–30 (S.D.N.Y. 2019) (denying summary judgment to defendants; awaiting trial on protester's false-arrest and failure-to-train claims); *Packard v. City of New York*, 2020 WL 1467127 (S.D.N.Y. Mar. 25, 2020) (denying summary judgment to defendants; awaiting trial).

[7] *See, e.g.*, *MacNamara v. City of New York*, No. 04-cv-9216 (S.D.N.Y.) (ECF 536) ($6.6 million class settlement); *Kunstler v. City of New York*, No. 04-cv-01145 (S.D.N.Y.) (ECF 173) ($2 million settlement); *Peat v. City of New York*, No. 12-cv-8230 (S.D.N.Y.) (ECF 46, 47) ($333,000); *Gerskovich v. Iocco*, No. 15-cv-7280 (S.D.N.Y.) (ECF

60. According to a ProPublica review of CCRB data between 2014 and 2018, in 240 of the 600 most serious cases in which the CCRB recommended charges, the police commissioner used his unchecked power over police discipline to reduce CCRB-recommended penalties, including in 40 cases in which no discipline was imposed.

61. According to CCRB data, in 2019, the police commissioner concurred with the discipline recommended by the CCRB for the most serious infractions only 21 percent of the time.

62. The NYPD's failure to discipline officers for the use of excessive force, unlawful detention arrests, and chilling of conduct protected by the First Amendment have ensured that these same and other officers keep engaging in such unconstitutional actions.

63. Despite repeated notice about NYPD's shortcomings in lawfully managing protests, the City's recent conduct shows that it failed to correct these practices and adequately supervise and train its officers on constitutional policing during a protest.

64. On October 20, 2020, the Chief of Department for the NYPD, Terence A. Monahan, admitted that "[a] lot of cops had not received disorder trainings since they first came on the job."

65. Further, in its December 2020 report, the New York City Department of Investigation concluded that before the George Floyd protests, the "NYPD lacked standardized, agency-wide, in-service training related to policing protests."[8]

---

194) ($256,000); *Occupy Wall Street v. City of New York*, No. 12-cv-4129 (S.D.N.Y.) (ECF 33) ($233,349); *Dierken v. City of New York*, No. 12-cv-7462 (S.D.N.Y.) (ECF Nos. 45-1, 56-64) ($145,009 settlement, plus attorneys' fees); *Douglas v. City of New York*, No. 14-cv-8124 (S.D.N.Y.) (ECF 104) ($145,000); *Marlin v. City of New York*, No. 15-cv-2235 (S.D.N.Y.) (ECF 78) ($125,000).

[8] New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

66. Further, the New York City Corporation Counsel's 2020 report concluded that the NYPD's Patrol Guide does not include specific detail on policing protests or safeguarding peaceful assemblies.[9]

67. The City repeatedly had notice that the NYPD was improperly training officers in policing protests long before the George Floyd protests, yet the City took no action to correct officer training. The City's failure caused mass violations of individuals' constitutional rights, including the rights of Mr. Boykin.

68. The NYPD's training of officers deployed to protests was deficient in many aspects, including little, or in many cases, no training for officers on policing lawful First Amendment events. A majority of the police officers deployed at protests during the George Floyd protests received no in-service refresher trainings on protest policing beyond what they received at the police academy. And training materials that are provided to new recruits place little emphasis on de-escalation tactics.

69. Mr. Boykin intends to continue his career as a freelance reporter covering newsworthy protests from public locations, including activities in New York City, but fears further obstruction, harassment, and detention by the NYPD. That fear makes it harder for him to gather news for dissemination to the public and interferes with him doing his job effectively.

## COUNT ONE

### 42 U.S.C. § 1983 - Violation of the First Amendment

70. Mr. Boykin repeats and re-alleges the allegations set forth in paragraphs 1–69 above, as if fully set forth here.

---

[9] New York City Law Department Office of the Corporation Counsel, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

71. The First Amendment protects the free expression of protected speech and the rights to peaceably assemble and associate. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006). It also protects the right of journalists and the public to gather information, including recording police activity. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 783 (1978); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015).

72. The NYPD arrested Mr. Boykin.

73. The NYPD violated Mr. Boykin's rights under the First Amendment to freedom of the press and freedom of speech by interfering with his ability to gather information and cover a matter of public interest as a member of the press.

74. The freedom of speech and freedom of the press clauses of the First Amendment protects Mr. Boykin's ability to gather information as a member of the press, including observing and recording public protests for public dissemination.

75. When the NYPD arrested Mr. Boykin, the NYPD's unofficial custom or practice was to obstruct or prevent members of the press from recording protests in public locations and the police's response to such protests, in violation of the First Amendment.

76. The City has implemented, enforced, encouraged, and sanctioned and/or ratified policies, practices, and/or customs of punishing the conduct of protest attendees, including Mr. Boykin, protected by the First Amendment in retaliation for, and to prevent them from further, exercising those rights, including through (a) the failure to adequately and properly screen, train, and supervise NYPD Officers; (b) the failure to properly and adequately monitor and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of and the failure to remedy, the NYPD's practice of chilling conduct protected by the First Amendment at the protests.

77. Those policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

   a. restricting peaceful assemblies and the expression of protected speech by protesters through false arrests, excessive force, threats of arrest or other force, and the selective enforcement of laws and regulations;

   b. retaliating against peaceful protesters for expressing their actual or perceived message against police violence and racial injustice;

   c. restricting the right of journalists, legal observers, and members of the public to monitor and report on police conduct through false arrests, excessive force, threats of arrest or other force, and the selective enforcement of laws and regulations; and

   d. retaliating against journalists, legal observers, and members of the public lawfully for exercising their right to observe, record, and report on police activity and misconduct.

78. Because of these policies, practices, and customs, the NYPD deprived Mr. Boykin of his liberty, property, and constitutional rights, including through the chilling of his First Amendment-protected activity.

79. The City had ample notice that NYPD officers' training and supervision were inadequate and were likely to lead to constitutional violations based on complaints of First Amendment violations at large-scale protests within the last two decades, as documented in reports, lawsuits, and CCRB complaints. Thus, at all times relevant to this Complaint, the City knew that the NYPD maintained an unofficial custom or practice of failing to provide its police officers proper training or adequate supervision on the First Amendment.

80. The City engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Mr. Boykin's First Amendment rights. The City's acts and omissions have directly and proximately chilled and thus violated Mr. Boykin's First Amendment rights. By acting under the color of state law to deprive Mr. Boykin of his rights under the First Amendment, the City violated 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of those rights secured by the United States Constitution.

81. The NYPD curtailed Mr. Boykin's First Amendment rights.

## COUNT TWO

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment

82. Mr. Boykin repeats and realleges the allegations set forth in paragraphs 1–81 above, as if fully set forth here.

83. The Fourth Amendment protects individuals from unlawful detention and arrest. *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003). Thus, Mr. Boykin has a right under the Fourth Amendment to be free from unreasonable searches and seizures.

84. The NYPD implemented, enforced, encouraged, sanctioned, and/or ratified policies, practices, and/or customs of effecting unlawful detentions and arrests against protest attendees in violation of the Fourth Amendment, including through (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to properly and adequately monitor and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to remedy, the NYPD's practice of making unlawful detentions and arrests before and at the protests and other prior demonstrations.

85. Those policies, practices, and customs include, but are not limited to, the following unconstitutional practices:

a. failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given before effecting arrests in connection with peaceful assemblies;

b. arresting people without ensuring that constitutionally sufficient notice and opportunity to disperse were given;

c. arresting groups of protesters without probable cause; and

d. using kettling to corral and trap perceived participants of peaceful assemblies, unlawfully detaining them without any individualized probable cause or reasonable suspicion.

86. As a result of these policies, practices, and customs, the NYPD deprived Mr. Boykin of his liberty, property, and constitutional rights, including by violating Mr. Boykin's Fourth Amendment rights.

87. The NYPD violated Mr. Boykin's established right to be free from unlawful searches and seizures when the NYPD officers arrested and detained him, all without probable cause to believe that he had engaged in criminal activity or committed any crime.

88. The NYPD engaged in these actions willfully and knowingly, acting with deliberate indifference to Mr. Boykin's Fourth Amendment rights.

89. When the NYPD arrested Mr. Boykin, the NYPD's unofficial custom or practice was to obstruct or prevent members of the press from recording protests in public locations and the police's response to such protests, in violation of the Fourth Amendment.

90. The City had ample notice that NYPD officers' training and supervision were inadequate and were likely to cause constitutional violations based on hundreds of incidents of false arrest at large-scale protests within the last two decades, as documented in reports, lawsuits,

and CCRB complaints. Thus, at all times relevant to this Complaint, the City knew that the NYPD maintained an unofficial custom or practice of failing to provide its police officers with proper training or adequate supervision on the Fourth Amendment.

91. The City engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Mr. Boykin's Fourth Amendment rights. The City's acts and omissions have directly and proximately chilled and thus violated Mr. Boykin's Fourth Amendment rights. By acting under the color of state law to deprive Mr. Boykin of his rights under the Fourth Amendment, the City violated 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of those rights secured by the United States Constitution.

92. The NYPD curtailed Mr. Boykin's Fourth Amendment rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Boykin requests judgment as follows:

a) On Counts One and Two, awarding damages in favor of Mr. Boykin, in an amount to be determined at trial;

b) Granting Mr. Boykin attorneys' fees and other costs incurred in bringing this action under 42 U.S.C. § 1988; and

c) Granting Mr. Boykin such other and further relief as the court deems just and proper.

Dated: May 6, 2022
      New York, New York                       By: */s/ Elie Honig*
                                                    Elie Honig, Esq.
                                                    Claudia Lorenzo, Esq.
                                                    Andrew L. Dubin, Esq.
                                                    **LOWENSTEIN SANDLER LLP**
                                                    1251 Avenue of the Americas
                                                    New York, NY 10020
                                                    Tel.: 973-597-6252
                                                    Fax: 973-597-2400

-18-

ehonig@lowenstein.com

*Attorneys for Plaintiff Keith Boykin*

## **JURY DEMAND**

Under Federal Rule of Civil Procedure 38, Mr. Boykin demands a trial by jury on all issues so triable.

## **DESIGNATION OF TRIAL COUNSEL**

Elie Honig, Esq. is hereby designated as trial counsel for Plaintiff Keith Boykin in the within matter.

By: */s/ Elie Honig*  _____
Elie Honig, Esq.
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel:   973-597-6252
Fax:   973-597-2400
ehonig@lowenstein.com

*Attorney for Plaintiff Keith Boykin*

## **CERTIFICATION OF SERVICE**

I, the undersigned certify that on this date I forwarded a copy of the within pleading to all counsel of record by CM/ECF.

Dated: May 6, 2022                                           By: */s/ Elie Honig*
                                                                                   Elie Honig, Esq.